EFRAÍN, ANA ROSA, LUIS F., ILIA y JOSÉ G. MAESO, ETC., demandantes y recurridos, *v.* THE CHASE MANHATTAN BANK (NATIONAL ASSOCIATION), demandado y recurrente.

*Número:* RE-90-98          *Resuelto:* 29 de abril de 1993

*Roberto López García*, abogado del recurrente; *Melvin Rosario Rodríguez*, abogado del recurrido.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

I

El 30 de marzo de 1961, Gerardo Maeso Birriel y otros familiares vendieron a Haydée Llabrés Vda. de Muxworthy sus participaciones en común pro indiviso[1] en unas fincas por $452,900 con sus edificaciones. Como el total de los condominios y las participaciones de los vendedores ascendía al 81.66%, les correspondió $369,838.14. El precio se pagó de la manera siguiente: $14,700 que recibieron en el acto; $9,800 el 30 de septiembre de 1961, y $34,300 el 30 de marzo de 1962. El balance de $311,038.14 quedó aplazado a ser satisfecho en un término no mayor de diez (10) años, constituyéndose sobre las fincas un gravamen hipotecario por igual suma a favor de los vendedores.

En la décima cláusula de la escritura se acordó:

"DÉCIMO: Es parte de las obligaciones y condiciones de esta compraventa que los comparecientes DOÑA AMPARO MAESO

---

[1] Según la Escritura Núm. 3 otorgada en San Juan ante el notario público Elmer Toro Lucchetti, dos (2) de las codueñas eran incapaces jurídicamente para efectuar el negocio. En la escritura, los vendedores se comprometieron a realizar todo "acto que fuere necesario de cualquier índole para ayudar a la Compradora a obtener judicialmente y por compraventa los condominios adicionales de las incapacitadas ...".

BIRRIEL Y DON GERARDO MAESO BIRRIEL recibirán cada uno un solar segregado de aproximadamente Dos Mil Metros (2,000 m.) los cuales se designará, DIGO, los cuales no colindarán entre sí, y cuya ubicación se designará mutuamente por cada uno de ellos y la Compradora." Recurso de revisión, pág. 2.

La cláusula vigésimo octava aclaró que esas parcelas tendrían una cabida de 2,161.50m. La compradora Doña Haydée se comprometió a gestionar en la Junta de Planificación su segregación en un mes. Trataría que la parcela correspondiente a Doña Amparo Maeso Birriel ubicara en el lugar de su residencia. En cuanto a Don Gerardo, disponía la escritura que "su parcela sería asignada en el área que abre a la carretera de Trujillo Bajo, y lo más cerca posible de donde tiene una casa de su propiedad". Cláusula décimoquinta.

Se convino, también, que la compradora Doña Haydée, a su opción, podía *resolver* la compraventa (perdiendo el dinero pagado), si en el término de dos (2) años no obtenía la reclasificación de los terrenos. Se consignó, como condición especialísima, que la compraventa era a $2,500 por cuerda, resultando así que se trataba de una venta a razón de un tanto por unidad de medida. Se acordó que la obligación del precio aplazado quedaría garantizada únicamente con la hipoteca constituida.

Por último, la cláusula vigésimo tercera de la escritura dispuso:

"Los derechos y obligaciones que se contienen en este instrumento continuarán en existencia en cuanto a cualquier cesionario o sucesor en interés de cualquiera de las partes comparecientes."

La escritura se inscribió en el Registro de la Propiedad. La compradora Doña Haydée cumplió con Doña Amparo, mas no con Don Gerardo.

Así las cosas, el 1ro de julio de 1963 Doña Haydée agrupó las fincas adquiridas con otra (Núm. 305) y las vendió a James T. Barnes de Puerto Rico, Inc. A su vez, esta

corporación la vendió a Lomas de Carolina Corporation el 23 de noviembre de 1968. Más adelante, el 14 de julio de 1980 el Chase Manhattan Bank advino titular del remanente de la finca, al adjudicársela como resultado de una ejecución de hipoteca.

El 9 de noviembre de 1984, los sucesores de Don Gerardo solicitaron del Tribunal Superior, Sala de Carolina, el cumplimiento específico de la obligación que Doña Haydée había contraído con su causante. La demanda se dirigió contra el Chase Manhattan Bank (Chase), titular de la finca, a base de que el derecho pactado era de naturaleza real.

Oportunamente, el tribunal de instancia (Hon. Benigno Dapena Yordán, Juez) dictaminó que las disposiciones de la escritura inscrita en el Registro de la Propiedad constituían un derecho real sobre la referida propiedad. Concluyó que ese derecho dotaba a los demandantes Maeso de una acción real de treinta (30) años que no estaba prescrita. Declaró con lugar la demanda y ordenó al Chase entregar la parcela reclamada. Acordamos revisar este dictamen.(²)

## II

Precisar qué constituye la naturaleza del derecho real es una tarea compleja cuya conclusión definitiva sigue eludiendo a la doctrina científica.(³) A primera vista, la solu-

---

(²) El Chase Manhattan Bank (Chase) argumenta como errores: (1) determinar que una mención en el Registro de la Propiedad tiene efectos contra terceros; (2) que la obligación de constituir un derecho real es un derecho real y no personal; (3) imponerle la obligación de cumplir con una obligación personal pactada por un predecesor en título; (4) que la acción no estaba prescrita; (5) que no eran partes indispensables en el pleito los titulares de porciones de terrenos segregados de la finca sobre la cual se constituyó la obligación personal; (6) que el demandado recurrente era más responsable que otros titulares de cumplir con una obligación personal pactada por un predecesor en título, y (7) que el hecho de que el causante de los demandantes hubiese seleccionado el predio de terreno deseado no hacía improcedente la demanda.

(³) En palabras del profesor Vázquez Bote:

ción de este recurso parecía requerir que nos expresáramos sobre la naturaleza del derecho adquirido por el causante Don Gerardo, esto es, la naturaleza jurídica del derecho real distinguible del personal o de crédito. No es necesario. Podemos precisar la naturaleza del derecho aquí involucrado sin entrar en ese interesante debate.

Como indicáramos, el ilustrado tribunal de instancia resolvió que el derecho de Don Gerardo a recibir el solar, según la escritura, era real. Añadió que podía determinarse con certeza la cantidad de terreno objeto de esa obligación y la forma de cumplirla. Erró.

Básicamente existen dos (2) posibilidades para que Don Gerardo, causante de los demandantes Maeso, hubiese adquirido un derecho real. La primera, que el negocio realizado le hubiera transmitido el derecho de propiedad sobre el solar y, la segunda, que las partes hubiesen tenido la intención de constituir una *nueva* figura de derecho real.

Al respecto, la fuente de la cual surgiría el derecho real pretendido sería la cláusula décima. En lo pertinente, dispuso que era parte de las *obligaciones* y condiciones *de esta compraventa* que los comparecientes *recibirían* cada uno un solar segregado los cuales no colindarán entre sí, y cuya ubicación *se designará* mutuamente por cada uno de ellos y la compradora Doña Haydée.

██ De inmediato, es claro que el solo acuerdo de Don Gerardo con la compradora Doña Haydée sobre la posible ubicación del solar —faltando su segregación— no le trans-

---

"Así como un gran número de instituciones jurídicas ofrecen a los ojos de la doctrina unanimidad en punto a la determinación de su significado, variando las opiniones y tendencias en orden a circunstancias de carácter secundario, o en consecuencias más o menos relevantes pero siempre de orden subsiguiente, existen otras que, por el contrario, ofrecen una inprecisión entre los estudiosos que alcanza incluso el criterio definidor, provocando con ello serias dudas y vacilaciones en cuestiones básicas. Esto es lo que ocurre con el derecho real, que ofrece como problema primario el de la determinación de sus naturaleza jurídica, la fijación de ésta; y no sólo con finalidad sistemática, de distinguir el derecho real de otras figuras jurídicas, sino previamente para saber que es el derecho real (Puig Peña)." E. Vázquez Bote, *Tratado teórico práctico y crítico de derecho privado puertorriqueño*, New Hampshire, Ed. Equity, 1991, T. VII, pág. 101.

firió su dominio. Para adquirir la propiedad no bastaba el contrato, era menester su entrega. El Art. 549 de nuestro Código Civil dispone:

La propiedad se adquiere por la ocupación.

La propiedad y los demás derechos sobre los bienes se adquieren y transmiten por la ley, por donación, por sucesión testada e intestada y por consecuencia de ciertos contratos mediante la tradición.

Puede también adquirirse por medio de la prescripción. 31 L.P.R.A. sec. 1931.

Este precepto incorpora en nuestro ordenamiento la teoría que exige que concurran los requisitos de título y modo para la adquisición por contrato de la propiedad. Vázquez Bote, *op. cit.*, págs. 119–120; J. Castán Tobeñas, *Derecho civil español, común y foral*, 13ra ed., Madrid, Ed. Reus, 1987, T. 2, Vol. I, págs. 287–291; L. Díez Picazo y A. Gullón, *Sistema de Derecho Civil*, 4ta ed. rev., Madrid, Ed. Tecnos, 1989, Vol. III, págs. 69–70; J. Santos Briz, *Derecho Civil: Teoría y Práctica*, Madrid, Ed. Rev. Der. Privado, 1973, T. II, págs. 175–177. Se denomina "título" al "fundamento o causa jurídica de la adquisición", mientras que "modo" se refiere a "la transferencia de la posesión" del objeto de la adquisición. Castán Tobeñas, *op. cit.*, pág. 289. Esa transferencia no es otra cosa que la tradición.

En sentido corriente, la tradición se refiere a un hecho físico como lo es la entrega de la cosa. La nomenclatura del derecho civil trasciende ese significado y se emplea para señalar un efecto jurídico: la entrega de la posesión *con ánimo de transmitir la propiedad.* Esa entrega puede ser simultánea y, por lo tanto, responder al concepto de pago en el sentido amplio, como una *solutio* de una obligación preexistente o asumida de manera coetánea con el acto que ejecuta la tradición. J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1971, T. III, Vol. I, págs. 339–340.

El Código Civil, en su Art. 1351, alude a dos (2) de las formas que puede asumir la tradición: real e instrumental.(⁴) Esta última forma es la que aquí nos ocupa. En la tradición instrumental el otorgamiento de la escritura equivale a la entrega. El consentimiento al contrato conlleva implícitamente la anuencia a que la entrega se realice mediante el otorgamiento. Claro está, esta equivalencia entre escritura y entrega no está presente cuando "de la misma escritura resulta o se deduce claramente que no ha habido entrega". (Énfasis suprimido.) Díez-Picazo y Gullón, *op. cit.*, pág. 73.

De acuerdo con la teoría del título y el modo, si únicamente hay título, habrá una obligación personal. Si sólo hay tradición, sin estar fundamentada en un título, habrá una transferencia de posesión pero no del derecho real. Díez-Picazo y Gullón, *op. cit.*, pág. 68. Véase Vázquez Bote, *op. cit.*, págs. 355–356.

Según expuesto, la cláusula décima de la escritura dispone que *recibirán* un solar cuya ubicación se *designará*. Resulta, pues, de la propia escritura que no hubo el consentimiento para que el contrato equivaliese a la entrega. No hubo tradición y, por ende, el pacto sólo generó una obligación personal, un título, y no un derecho real. Esta cláusula definitivamente *no se hizo con el propósito de transmitir un derecho real sobre los solares.* La compradora Doña Haydée simplemente se obligó a entregar los solares, acto que se realizaría después por medio de una efectiva

---

(⁴) Este artículo, equivalente al 1462 del Código Civil español, dispone:

"Se entenderá entregada la cosa vendida cuando se ponga en poder y posesión del comprador.

"Cuando se haga la venta mediante escritura pública, el otorgamiento de ésta equivaldrá a la cosa objeto del contrato, si de la misma escritura no resultare o se dedujere claramente lo contrario." 31 L.P.R.A. sec. 3811.

El primer párrafo alude a la tradición real, el segundo a la instrumental. Vázquez Bote, *op. cit.*, págs. 361–362; J. Castán Tobeñas, *Derecho civil español, común y foral*, 13ra ed., Madrid, Ed. Reus, 1987, T. 2, págs. 337–338; L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 4ta ed. rev., Madrid, Ed. Tecnos, 1989, Vol. III, págs. 71–72; J. Santos Briz, *Derecho Civil: Teoría y Práctica*, Madrid, Ed. Rev. Der. Privado, 1973, T. II, pág. 200.

entrega con el ánimo de transmitir la titularidad. No hubo tradición por medio de la escritura.

## III

Sabido es que en Puerto Rico rige, en materia de creación de derechos reales, la doctrina de *numerus apertus* que admite la posibilidad de crear derechos reales fuera de los previstos por el Código Civil. *Borges v. Registrador*, 91 D.P.R. 112, 132 (1964); *Colón v. San Patricio Corporation*, 81 D.P.R. 242, 260 (1959). Distinto a lo que sucede respecto a la creación de derechos de crédito, nuestro ordenamiento no contiene un precepto análogo al Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372, que delimite el ámbito de la autonomía de la voluntad al crear derechos reales no previstos por el Código.

Díez-Picazo y Gullón distinguen las dificultades del problema —determinar si en un caso específico las partes han querido o no constituir un derecho real— y provee el siguiente critero para su solución:

> Ahora bien, reconocida la eficacia de la autonomía de la voluntad para la creación de los derechos reales, es claro que tiene que contar con unos límites al igual que los pone la ley en materia de derechos de obligación (art. 1.255). Cuestión distinta es la de resolver si en un determinado supuesto las partes han querido o no la constitución de un derecho real. Entendemos que si expresamente así lo han manifestado, lo que hay que ver es si se respetan los límites de la autonomía de la voluntad. *Pero si lo único que han hecho ha sido la manifestación de unos propósitos empíricos y la instrumentación jurídica adecuada, sin puntualizar que los efectos que se quieren deben ser o no reales, la interpretación ha de ser restrictiva en orden a los efectos reales y favorecedoras de los efectos meramente personales u obligacionales.* Es doctrina jurisprudencial reiterada, de aplicación en la órbita de los *iura in re aliena*, que la propiedad se presume libre de toda carga o limitación, y que ha de hacerse uso de una interpretación restrictiva en caso de duda sobre su existencia. (Énfasis suplido.) Díez-Picazo y Gullón, *op. cit.*, pág. 54.

Procede, pues, examinar desde esta perspectiva el contrato celebrado entre el causante de los demandantes Maeso y la compradora Doña Haydée.

Contrario a la conclusión del foro sentenciador, a los efectos de que la cláusula vigésimo tercera elevó a categoría de derecho real la obligación contraída por la compradora en la cláusula décima, nada hay en los términos del contrato que sostenga que esa haya sido la intención de las partes. Dicha cláusula *únicamente* dispone que los derechos y las obligaciones en la escritura continuarían existiendo en cuanto a cualquier cesionario o sucesor en interés de las partes. Se trata de una cláusula genérica cuya *referencia es el contrato en su totalidad*. Difícilmente puede servir para precisar cuáles de los derechos u obligaciones contraídas por la partes tendrían efectos reales. En esta materia —elevar una obligación a la categoría de derecho real— hemos de insistir en un lenguaje claro y terminante, no ambiguo, susceptible de diversas interpretaciones. No hay una manifestación expresa y clara en la escritura de que el derecho reclamado por los demandantes Maeso, en virtud de la cláusula décima, fuera a tener efectos reales.

En el contexto integral de todo el contrato, el alcance de la cláusula vigésimo tercera era informar a cualquier cesionario o sucesor en interés de las partes contrantes que su *transmitente tenía una obligación personal contraída a favor del señor Maeso*. Era parte del contrato entre la compradora original Doña Haydée y cualquier cesionario o sucesor en interés de ésta. Quienes adquiriesen los intereses de la compradora Doña Haydée *en el contrato* lo harían considerando esta cláusula, por lo que no podrían oponerse a su efecto mientras estuviese vigente.(5)

---

(5) La publicidad del registro no se extiende a la obligación plasmada en la cláusula décima. Recuérdese que el Art. 101 de la Ley Hipotecaria y del Registro de la Propiedad, 30 L.P.R.A. sec. 2351, dispone:

"La publicidad del Registro no se extenderá a la mención de derechos susceptibles de inscripción separada y especial. Y tanto dichos derechos como los personales

En resumen, estamos ante una situación en la que los solares que habrían de recibir los covendedores eran parte del precio de la compraventa. El pago del precio sólo es una obligación personal en la que incurre el comprador al realizarse una compraventa.

## IV

Finalmente, anotamos que la deuda de la compradora Doña Haydée era exigible a partir del mes del otorgamiento de la escritura. Por ser una acción personal, tenía un término prescriptivo de quince (15) años.[6] Transcurrido en exceso, la acción estaba prescrita.[7]

Por los fundamentos que anteceden, *se dictará sentencia revocatoria.*

El Juez Asociado Señor Alonso Alonso concurrió con el resultado sin opinión escrita. El Juez Asociado Señor Fuster Berlingeri disintió sin opinión escrita.

---

que carezcan de especial aseguramiento no tendrán condición de gravámenes, a excepción de los efectos correspondientes a las condiciones suspensivas y resolutorias inscritas, así como la trascendencia real de las causas que consten explícitamente del Registro sobre la naturaleza y extensión de los derechos inscritos.

"Los derechos personales que carezcan de especial aseguramiento y las menciones de derechos susceptibles de inscripción separada y especial, serán cancelados por el registrador de oficio o a instancia de parte interesada."

[6] A igual solución arribaríamos si resolviéramos que el Chase "no es cualquier cesionario o sucesor en interés" de la compradora Doña Haydée.

[7] Este resultado hace innecesario considerar los restantes señalamientos de error.