# 2001 DTA 132

## TRIBUNAL DE CIRCUITO DE APELACIONES
## CIRCUITO REGIONAL DE AGUADILLA/MAYAGUEZ
## PANEL IV

EDUARDO ARTAU
Proponente-Recurrido

v.

HOSPITAL DE LA CONCEPCION, INC. Y HOSPITAL PEREA, INC.
Recurrentes

Núm. KLRA-00-00549

San Juan, Puerto Rico, a 16 de marzo de 2001

Panel integrado por su Presidenta, la Juez López Vilanova,
el Juez Córdova Arone y la Juez Feliciano Acevedo

Feliciano Acevedo, Jueza Ponente

## TEXTO COMPLETO DE LA RESOLUCION

Mediante el presente recurso, Hospital De la Concepción, Inc., y Hospital Perea, Inc., nos solicitan revisar una resolución emitida el 26 de mayo de 2000, por la Secretaria de Salud ("*la Secretaria*"). Mediante la misina se otorgó un Certificado de Necesidad y Conveniencia (CNC) al Hospital Metropolitano de San Germán para reclasificar en sus facilidades cuarenta (40) camas de cuidado extendido a camas agudas. Al así actuar, la Secretaria de Salud acogió un informe y recomendación sometido a esos fines por la Lcda. Jeannette Arias, Oficial Examinadora de la agencia. Los hechos que enmarcan esta controversia son los siguientes.

El 17 de febrero de 2000, el proponente-recurrido solicitó el CNC cuya concesión se impugna mediante este recurso. El Hospital La Concepción compareció como opositor a dichos procedimientos, y el 12 de abril de 2000 solicitó la paralización de los mismos. En apoyo de su solicitud de parcialización, adujo que el estudio de viabilidad económica sometido por el solicitante del CNC carecía de un estudio financiero. Posteriormente, el Hospital Perea también compareció como opositor y sometió un pliego de interrogatorios al proponente-recurrido el 1 de mayo de 2000. El Hospital La Concepción también le sometió interrogatorios el día 5 de ese mismo mes y año. Ambos fueron contestados el 10 de mayo de 2000.

Cabe destacar, que la solicitud de paralización de los procedimientos fue denegada. Posteriormente, mediante carta fechada 25 de abril de 2000 se notificó a las partes que la correspondiente vista administrativa se celebraría el 19 de mayo de ese mismo año. El proponente-recurrido citó a los abogados de las partes opositoras a una primera reunión el 9 de mayo de 2000 a los fines de preparar el Informe Preliminar o Acta con Antelación a Vista. Por no estar las partes opositoras preparadas para ello, no comparecieron, y fueron nuevamente citadas con el mismo propósito para el 16 de mayo de 2000. Tampoco asistieron a la reunión pautada. Luego se opusieron a la celebración de la vista alegando de nuevo que no estaban preparados y solicitaron su conversión a una sobre el estado de los procedimientos. Así las cosas, el día de la vista administrativa, la Oficial Examinadora recibió de las partes informes por separado.

Previamente, el 17 de mayo de 2000, los abogados de las partes sostuvieron una conferencia telefónica con la Oficial Examinadora. Durante dicha conferencia, se les explicó que la vista administrativa se celebraría en la fecha señalada y se resolvieron los planteamientos que motivaban la solicitud de suspensión instada. Ambos opositores plantearon que la vista debía ser suspendida porque, alegadamente, algunas contestaciones al interrogatorio que enviara el Hospital La Concepción al proponente no eran responsivas; los planos de construcción no les habían sido notificados, se les había notificado una enmienda al estudio de viabilidad consistente de dos (2) hojas que contenían el desglose de los gastos de construcción, y la propuesta estaba a nombre del Sr. Eduardo Artau, Presidente de Southwest, y no a nombre de la corporación proponente.

Así, pues, en cuanto a dichos planteamientos, la Oficial Examinadora finalmente determinó: (1) que no había nada en la moción solicitando la paralización de los procedimientos que ameritara la suspensión de la vista; (2) que los planos de construcción no eran necesarios para la celebración de la misma, debido a que el Reglamento Núm. 89 no requería la presentación de planos de construcción, y en la mayoría de los casos

presentados ante la agencia no se incluían como parte de la prueba, y que, por ende, no había que evaluarlos; (4) en cuanto a la enmienda al estudio de viabilidad, expresó que dicha información había sido solicitada como parte del interrogatorio, que el proponente había preparado el desglose de costo de construcción para someterlo como anejo y el mismo fue retirado, dada la objeción de los opositores, quienes alegaron que no estaban preparados porque el documento no había sido recibido con suficiente antelación, ello a pesar de que la información estaba contenida en el estudio de viabilidad, aunque no desglosada; y (5) en cuanto a la solicitud de que no se permitiera enmendar la propuesta para sustituir el nombre del proponente, determinó que no causaba perjuicio a parte alguna permitir la misma y que surgía del expediente que el proponente era el Hospital Metropolitano.

Se celebró la vista administrativa el 19 de mayo de 2000. Compareció el proponente, Hospital Metropolitano de San Germán, representado por los licenciados Peter Ortiz y Benjamín Ortiz Belaval. Comparecieron como opositores, el Hospital Perea, representado por el Lcdo. Jorge Galvá, y el Hospital La Concepción, representado por el Lcdo. Mario L. Paniagua. El proponente-recurrido presentó como testigo al Sr. Eduardo Artau Gómez, quien fue contrainterrogado por los opositores. El único testigo que declaró por el Hospital La Concepción fue el Lcdo. Jaime Maestre, el cual fue contrainterrogado por el proponente-recurrido. Ninguno de los recurrentes presentó prueba testifical, pericial, ni documental. El Hospital Perea no presentó prueba testifical, pericial, ni documental.

Luego de celebrada dicha vista, la Oficial Examinadora rindió su informe el 26 de mayo de 2000, en el cual, después de formular sus conclusiones de hechos y de derecho, recomendó a la Secretaria de Salud la otorgación del CNC al proponente-recurrido. Concluyó que éste cumplía sustancialmente con los requisitos de ley para la concesión del mismo. Así las cosas, en esa fecha, la Secretaria de Salud emitió la resolución recurrida, acogiendo la recomendación de la Oficial Examinadora. En dicho informe se recogieron las determinaciones de hechos que se exponen a continuación.

El 30 de abril de 1999, el Estado Libre Asociado de Puerto Rico ("el E.L.A.") le vendió a la Southwest Health Corp. Inc. ("Southwest"), el Centro de Salud de Area Dr. Edgardo Quiñones, localizado en la Calle Javilla en el Municipio de San Germán. Al comprar dicha facilidad, Southwest también adquirió un edificio de dos (2) pisos de bloques y hormigón usado como hospital regional; una licencia del Departamento de Salud, previamente concedida al Centro de Salud de San Germán del E.L.A., autorizando su operación con cuarenta y dos (42) camas agudas; las licencias para operar un laboratorio clínico y una farmacia; el CNC de las cuarenta y dos (42) camas agudas, y el CNC autorizando a la institución a operar cuarenta (40) camas de cuidado extendido ("Skilled Nursing Facility" o "SNF").

En adición, dicho contrato de compraventa incluyó la titularidad sobre el predio de terreno de 2.159 cuerdas donde ubica el edificio antes mencionado. Southwest, además de ser dueña de estas facilidades, también es dueña del Centro de Diagnóstico y Tratamiento del Municipio de Cabo Rojo. El Centro de Salud de San Germán pasó a llamarse entonces, Hospital Metropolitano de San Germán. En la actualidad, esa institución distribuye sus cuarenta y dos (42) camas agudas en cuatro (4) de intensivo, dos (2) de telemetría, seis (6) camas pediátricas; las restantes treinta (30) camas están autorizadas para cirugía, medicina interna, ginecología y obstetricia.

El Hospital Metropolitano de San Germán ofrece clínicas externas, cuenta con dos (2) salas de operaciones y una (1) sala de emergencia que opera las veinticuatro (24) horas, una (1) sala de partos y ante partos, un cuarto de recuperación y un (1) nursery. Los planes ohH2211 de desarrollo de la institución contemplan la remodelación de la farmacia y del laboratorio y la expansión de los servicios de radiología convencional y fluoroscopía para que incluyan Tomografía Computarizada, Resonancia Magnética Nuclear, Mamografía, Sonografía y Medicina Nuclear.

El Sr. Eduardo Artau Gómez es el Presidente de la Southwest y del plan médico First Medical. Sus

facilidades en la Región Oeste participan de la Reforma de Salud del Gobierno de Puerto Rico. El Hospital Metropolitano de San Germán cuenta con un Centro IPA que al momento de emitirse la resolución recurrida atendía casi 5,000 vidas. El CDT de Cabo Rojo, el cual también pertenece a la Southwest, cuenta con otro Centro IPA que atiende casi 1,000 vidas. Al sumarse los centros IPA de Southwest y los servicios provistos por First Medical en la Región de Salud del Oeste, la parte proponente-recurrida cuenta con más de 24,000 vidas a las cuales ofrece sus servicios médicos y hospitalarios.

Actualmente, la Sala de Emergencia del Hospital Metropolitano de San Germán está atendiendo 2,200 pacientes todos los meses. El CDT de Cabo Rojo tiene una Sala de Emergencia que atiende un promedio de 1,800 pacientes mensuales. De esos pacientes, alrededor de 400 requieren hospitalización y en la actualidad parte de ellos tienen que ser referidos a otras instituciones hospitalarias de la región. En el informe y recomendación sometido a la Secretaría, la Oficial Examinadora consignó que había sido demostrado ante la agencia que resultaba administrativamente eficiente, en términos de costos de operaciones, añadir 40 camas agudas a las 42 de ese tipo que ya estaban operando en el Hospital Metropolitano de San Germán. A esos fines, la proponente-recurrida construirá un segundo piso en dicho hospital, acomodando las 40 camas adicionales de manera similar a las que ya están en operación, mediante una inversión aproximada de $1,220,000.00. Southwest, y su Presidente, el Sr. Artau Gómez, cuentan con el financiamiento disponible, por parte del Western Bank para hacer dicha inversión.

La Región de Salud del Oeste está compuesta por los municipios de Cabo Rojo, Hormigueros, Lajas, Mayagüez, Sabana Grande y San Germán. El área de servicios de la facilidad propuesta es la Región de Salud del Oeste. La población de dicha región ascendió a 235,180 en 1990. De acuerdo con el Negociado del Censo, en 1998, la población del área había ascendido a 257,600. De mantener ese ritmo de crecimiento, la población residente del área ascenderá a 267,041 en el año 2001.

Actualmente, en la Región de Salud del Oeste operan 1,023 camas agudas, incluidas las 42 camas de ese tipo que operan en el Hospital Metropolitano de San Germán. Después de reclasificar las 40 camas presentes a camas agudas, la Región de Salud del Oeste contará con 1,063 camas, representando ésto una disminución del nivel de concentración del índice conocido como HHI ("*Herfindahl-Hirshman Index*"), de 2209 puntos a 2089 puntos, una reducción significativa en el nivel de concentración de 119 puntos.

Según las guías federales que clasifican las industrias por su nivel de concentración a base del Indice HHI, un cambio o reducción de 100 puntos o más en un cambio significativo en términos de la competencia de las empresas en un mercado determinado. La Oficial Examinadora expresó que la concesión al proponente-recurrido de las 40 camas agudas cumple con los requisitos del Reglamento 89 del Departamento de Salud sobre el HHI.

En el año 1990, en Puerto Rico se generaron 11.7 altas en los hospitales generales por cada 1,000 habitantes. La estadía promedio en un hospital fue de 4.63 días. Para el año 2001, las altas por cada 1,000 habitantes serán de 95.9 y la estadía promedio en un hospital será de 3.81 días. La demanda de servicios de hospitalización para la Región Oeste durante el año 2001 será de 95.875 días-paciente al año. Al aprobarse la propuesta reclasificación de camas, las 82 camas agudas del Hospital Metropolitano de San Germán captarán en su primer año de operaciones unos 13,469 días-paciente, lo que representa sólo un catorce por ciento (14%) de la demanda generada en la Región Oeste.

La reclasificación de las 40 camas presentes implica una inversión fija de aproximadamente $1,220,000.00 en planta física y equipo. Los gastos salariales se estimaron sobre la base del tiempo equivalente a 4.5 empleados por cama ocupada, ascendiendo a un salario promedio mensual de $14,400.00 por cama y beneficios marginales de 24% de la nómina. Durante su primer año de operaciones, para efectos del estado de ingresos y gastos proyectados, ya añadidas las 40 camas agudas, el Hospital Metropolitano de San Germán tendrá un ingreso neto total por servicios a pacientes de $7,075,174.00 y un total de gastos operacionales de

$6,805,312.00, lo cual arroja un beneficio, después de impuestos, de $563,949.00.

Según el informe, la operación del total de camas una vez añadidas las 40 camas agudas propuestas, es viable económicamente y genera un rendimiento razonable. En éste se concluyó que dada la situación demográfica de la Región Oeste, la demanda por servicios de hospitalización y los servicios y facilidades que ofrecerá el Hospital Metropolitano de San Germán, dicha facilidad ofrecerá un servicio necesario y conveniente para la población de la Región Oeste de Puerto Rico.

El 19 de junio de 2000, el recurrente, Hospital Perea, presentó moción de reconsideración ante la agencia. El día 21 de ese mismo mes y año, el Hospital La Concepción hizo lo mismo. No obstante, la agencia nunca se expresó en torno a éstas.

Inconformes con la determinación de la agencia, los opositores acudieron ante nos mediante el presente recurso de revisión, solicitando la revocación de la resolución de la Secretaria de Salud. Imputaron a la agencia la comisión de los siguientes errores:

*"A. La Secretaria actuó contrario a la Ley de Certificados de Necesidad y Conveniencia ("Ley de CNC's"), 24 L.P.R.A. § 334 et seq., al otorgarle el CNC que nos ocupa a una persona distinta al proponente, sin tan siquiera aquélla presentar una nueva propuesta, ni pagar los derechos requeridos por dicha ley.*

*B. La Secretaria abusó de su discreción y actuó arbitraria y particializadamente al hacer determinaciones de hechos y de derecho que contravenían su propia reglamentación interna, i.e., la "Orden para Reglamentar los Procedimientos de Celebración de Vista Administrativa en el Departamento de Salud del 16 de octubre de 1996" (Ap., págs. 1-4) (en adelante la "Orden para Reglamentar"), y específicamente, al celebrar la vista administrativa en una fecha a todas luces prematura y que privaba a los hospitales opositores de su derecho a presentar debidamente su prueba.*

*C. La Secretaria de Salud abusó de su discreción e hizo caso omiso de la prueba presentada al determinar que la moción propuesta era necesaria y viable y comparaba favorablemente con los criterios aplicables."*

Posteriormente, en fecha 3 de agosto de 2000, éstos presentaron una moción solicitando permiso para presentar una exposición narrativa estipulada de la prueba oral pertinente desfilada ante la agencia recurrida (E. N.P.). En fecha 12 de septiembre de 2000, este Tribunal emitió resolución concediendo treinta (30) días a las partes para presentar la E.N.P., y veinte (20) días al Sr. Artau para exponer su posición en torno al recurso instado.

El 28 de septiembre de 2000, el proponente-recurrido sometió una *"Moción Urgente sobre Extensión del Término para Cumplir Orden"*, la cual fue declarada No Ha Lugar por este Tribunal el 9 de octubre del mismo año. Luego de varios trámites procesales, el 6 de noviembre de 2000, el proponente-recurrido presentó su oposición al recurso instado, a lo cual los recurrentes replicaron. Con posterioridad, el proponente-recurrido y los recurrentes sometieron una moción conjunta a los fines de presentar la E.N.P.

Tras varios incidentes procesales, el Procurador General compareció en representación de la agencia recurrida, oponiéndose al recurso de revisión incoado. El 7 de marzo de 2001, el Hospital La Concepción replicó a este último escrito.

Examinada la totalidad del expediente, el derecho aplicable y con el beneficio de la comparecencia de todas las partes, procede disponer de la presente controversia.

## I

La Ley Núm. 2 de 7 de noviembre de 1975, según enmendada, 24 L.P.R.A. secs. 334-334u, instrumentó la

exigencia de obtención de un C.N.C. para toda prestación de un nuevo servicio, adquisición o construcción de una facilidad de salud. El propósito de dicha ley es alcanzar una planificación ordenada de las distintas facilidades de salud que permita una reducción de los costos de prestación de servicios de salud de acuerdo a la complejidad, de los núcleos poblacionales. Informe de la Comisión de Salud y Bienestar sobre el P. del S. 1233 de 14 de mayo de 1975. ■

El Tribunal Supremo ha resuelto que la emisión de certificados de necesidad y conveniencia constituye un mecanismo de planificación, mediante el cual el Secretario de Salud formula e implanta a la vez la política pública sobre los servicios de salud. *Laboratorio Clínico Instituto Central Medicina Avanzada* v. *Laboratorio Clínico Borinquen, Inc.,* Op. de 9 de septiembre de 1999, **99 J.T.S. 141;** *Ruiz Hernández* v. *Mahiques*, 120 D.P. R. 80 (1987). En *Ruiz Hernández*, se expresó que el Secretario, al otorgar o denegar un certificado de necesidad y conveniencia, no sólo concede o deniega un permiso para operar una facilidad de salud, sino que planifica el desarrollo de éstas en las distintas áreas regionales de salud, teniendo la facultad para reglamentar al mismo tiempo. Así, pues, dicha formulación de la política pública no se limita únicamente al mecanismo de reglamentación, sino que se extiende al de adjudicación.

## II

Examinemos en primer lugar el señalamiento de error esbozado por los recurrentes en cuanto a que la Secretaria de Salud violó la Ley Núm. 2, *supra,* al otorgar el CNC a una persona distinta al proponente. Los recurrentes basan su alegación en el hecho de que en el formulario de solicitud del CNC objeto de esta controveria, el Sr. Eduardo Artau es quien aparece como la persona que solicitaba la facilidad, El Reglamento Núm. 89 del Departamento de Salud, define al solicitante de un CNC como *"aquella persona que proyecte llevar a cabo cualquiera de las actividades reglamentadas en las secs. 334 a 334j del título 24 de L.P.R.A., esté o no exenta de la necesidad de solicitar un Certificado de Necesidad y Conveniencia a tenor con lo dispuesto en las secs. 334 a 334J de dicho título".* ■

No obstante lo expuesto por los recurrentes en sus alegaciones, del expediente surge que durante todo el proceso ante la agencia recurrida quedó claramente establecido que la facilidad en la cual se proyectaba realizar la acción propuesta era el Hospital Metropolitano de San Germán, el que es propiedad de la corporación Southwest. Dicha corporación está presidida por el Sr. Artau, quien mediante resolución corporativa se encontraba facultado para representar a la entidad jurídica en transacciones en las cuales estuviera ésta envuelta. ■ Siendo el Sr. Artau el representante oficial de la Southwest, entidad que proyectaba realizar la acción propuesta, éste podía válidamente representar a dicha corporación en los procedimientos pertinententes ante el Departamento de Salud.

No habiendo demostrado los recurrentes que el Sr. Artau compareciera ante la agencia de otro modo que no fuera en su carácter de representante autorizado de la corporación que es propietaria de la facilidad a la cual se le expidió el CNC, ante las circunstancias mencionadas concluimos que el error señalado es inmeritorio.

## III

Procede entonces disponer del segundo planteamiento sometido a nuestra consideración por los recurrentes. Este se dirige, en esencia, a impugnar la celebración de la vista administrativa del caso el día 19 de mayo de 2000, lo que alegan fue prematuro.

En su escrito, los recurrentes aducen que haberles denegado la Oficial Examinadora encargada del caso su solicitud de convertir la vista adjudicativa en una sobre el estado de los procedimientos provocó que se realizara la misma sin ofrecérseles la oportunidad de prepararse adecuadamente para ella. En síntesis, alegan que la vista del caso se realizó en ausencia de determinada prueba que le habían requerido al proponente-recurrido, pero que éste no les suplió a tiempo, y que la agencia no les dejó terminar el descubrimiento de prueba dentro del término de treinta (30) días a partir de la fecha de envío de los interrogatorios. Plantean que la agencia no honró el referido término a pesar de éste haber sido establecido mediante una orden de 16 de octubre de 1996, emitida

por los oficiales examinadores del Departamento de Salud a los fines de regular los procedimientos adjudicativos ante sí.

La Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 de 12 de agosto de 1988, según enmendada, ("*la L.P.A.U.*") establece en su sección 3.9 que los organismos administrativos a los cuales aplica dicho estatuto han de notificar a las partes e interventores envueltos en los procedimientos que se lleven a cabo en la agencia, la fecha, hora y lugar en que se celebrará la adjudicativa del caso. Esta notificación deberá hacerse por correo o personalmente con no menos de quince (15) días de anticipación a la fecha de la vista, salvo justa causa para acortar dicho término, la cual deberá expresarse en la misma notificación, 3 L.P.R.A. sec. 2159. El Reglamento Núm. 85 del Departamento de Salud, en su Art. VIII (H) (1) dispone idéntico plazo a esos mismos fines. El objetivo de la citada disposición de la L.P.A.U. es permitir a las partes en procedimientos adjudicativos ante una agencia prepararse adecuadamente para la vista administrativa. *Departamento de Recreación y Deportes v. Asociación Recreativa Round Hill*, Op. de 19 de agosto de 1999, **99 J.T.S. 138**.

Dicho estatuto en su sección 3.12 dispone que el funcionario que presida el procedimiento adjudicativo no podrá suspender una vista ya señalada, excepto que se solicite por escrito con expresión de las causas que justifican dicha suspensión. Dicha solicitud será sometida con cinco (5) días de anticipación a la fecha de la vista. La parte peticionaria deberá enviar copias de su solicitud a las demás partes e interventores en el procedimiento, dentro de los (5) días señalados. 4 L.P.R.A. sec. 2162.

De otro lado, la L.P.A.U. en su sección 3.8 establece que los procedimientos de descubrimiento de prueba no serán de aplicación a los casos de adjudicación administrativa, a menos que se autoricen en los reglamentos de procedimiento de adjudicación de la agencia y así lo autorice el funcionario que presida el procedimiento adjudicativo. No obstante, en los reglamentos de las agencias se garantizará a todo querellado el derecho a los mecanismos de descubrimiento de prueba para los casos en que el procedimiento de adjudicación sea promovido a iniciativa de la agencia. 3 L.P.R.A. sec. 2158.

Cumpliendo dicha obligación de la L.P.A.U., la agencia recurrida aprobó el 5 de agosto de 1996, el Reglamento Núm. 85 del Secretario de Salud, con el objetivo de regular los procedimientos adjudicativos en este organismo. Esta pieza en su Artículo VIII, inciso (F) (1), también establece que los mecanismos de descubrimiento de prueba que prevalecen en las Reglas de Procedimiento Civil vigentes no serán de aplicación a los procedimientos que se ventilen ante el Departamento, excepto en aquellos casos en los cuales el procedimiento adjudicativo haya sido promovido a iniciativa de la propia agencia.

Asimismo, en cuanto a la posibilidad de realizar descubrimiento de prueba por las partes, este reglamento establece que ello se podrá autorizar discrecionalmente por el Oficial Examinador a cargo del caso, dentro de los criteiros de economía procesal y eficiencia que deben regir en todo organismo administrativo y en armonía con los términos de tiempo dispuestos por la Ley de Procedimiento Administrativo Uniforme. Reglamento Núm. 85, Art. VIII (F), *supra*.

El 16 de octubre de 1996, los Oficiales Examinadores del Departamento de Salud emitieron una orden para guiar los procedimientos de celebración de vistas administrativas en el Departamento de Salud. A pesar de que el referido documento expresa que su objetivo es reglamentar los procedimientos de celebración de vistas administrativas, lo cierto es que éste no alcanza la categoría de reglamento, al no haber sido aprobado bajo el procedimiento que a esos fines establece la L.P.A.U. en sus secciones 22.1 a 22.18. En dicho documento se establece que, salvo determinación en contrario, el descubrimiento de prueba en casos que no hayan sido promovidos por la agencia queda limitado a un sólo y breve pliego de interrogatorios y produción de documentos, el cual deberá ser notificado a la parte a la cual se dirija en un plazo no mayor de diez (10) días a partir de la fecha de notificación de la querella o señalamiento de vista en el caso de solicitudes de certificados de conveniencia, según sea el caso.

Dicha orden también señala que las partes habrán de terminar las gestiones relacionadas con el descubrimiento de prueba dentro de un término máximo de treinta (30) días a partir de la fecha en que se notifique el señalamiento de la vista. Según ésta, el pliego de interrogatorios y producción de documentos deberá ser contestado en el plazo de quince (15) días a partir de su notificación y salvo el término para su contestación, el contenido y procedimientos de éste deberán ser cónsonos con las Reglas 30 y 31 de las de Procedimiento Civil vigentes. En adición, esta orden expresa que cualquier incumplimiento de la parte a la que se le dirige el interrogatorio o cualquier objeción a preguntas formuladas deberá someterse mediante moción al efecto por la parte interesada en obtener un remedio en el término de cinco (5) días con antelación a la fecha en que termine el plazo concedido para realizar el descubrimiento de prueba en el caso.

Dispone, además, que luego de señalada la vista en su fondo de un caso, la misma no podrá ser suspendida salvo causa justificada y que se cumpla estrictamente con las disposiciones de la L.P.A.U. y del Reglamento de Procedimientos Adjudicativos de la agencia. Por ende, toda moción en solicitud de suspensión de vista debe estar fundamentada.

Atendidos los argumentos de los recurrentes, a la luz de la legislación aplicable, resulta forzoso concluir que el segundo señalamiento de error planteado mediante este recurso es también improcedente.

Del expediente surge que la Oficial Examinadora de la agencia, en el ejercicio de la discreción que le confiere la L.P.A.U. y el Reglamento Núm. 85 de la Agencia, permitió a los recurrentes enviar al proponente-recurrido sus pliegos de interrogatorios, habiendo sido éstos contestados oportunamente. Luego de haber recibido las contestaciones a los mismos, los recurrentes sometieron una moción presentando sus objeciones por escrito, requiriendo, entre otras cosas, la producción de los planos de construcción de la obra propuesta y solicitando la conversión de la vista en una sobre el estado de los procedimientos. En apoyo de sus contenciones, alegaron que el proponente-recurrido no les había suplido debidamente la evidencia que se le requiriera producir durante la etapa de descubrimiento de prueba, específicamente los planos y cierta información financiera. Sin embargo, como previamente expusiéramos, la Oficial Examinadora denegó ambas solicitudes, procediendo a celebrar la vista adjudicativa en la fecha señalada.

El Departamento de Salud había notificado a todas las partes en el caso el señalamiento de la vista adjudicativa con veinticuatro (24) días de anticipación a la fecha de su celebración, razón por la cual entendemos que no erró la Oficial Examinadora de la agencia al determinar que no procedía la suspensión de la misma por éstos no estar preparados para la misma. Habida cuenta de que la notificación de la vista fue cursada por la agencia en un término considerablemente mayor al requerido por ley, entendemos que resulta inmeritoria la contención de los recurrentes en cuanto a que ésta fue prematuramente celebrada por alegadamente no habérseles permitido prepararse adecuadamente. Ciertamente, éstos tuvieron tiempo más que suficiente para ello.

De otra parte, entendemos que el hecho de que los recurrentes objetaran el estudio de viabilidad económica de la acción propuesta sometido por el proponente-recurrido, tampoco ameritaba la suspensión de la vista. Examinemos las razones.

El Art. V del Reglamento Núm. 89, *supra*, requiere al solicitante de un C.N.C. someter a la agencia, junto a su solicitud, un estudio financiero de viabilidad económica del proyecto así como del impacto del mismo, si alguno, en relación con las facilidades de salud existentes en el área de servicio de la acción propuesta. Dicho estudio deberá incluir una descripción de la metodología utilizada, una descripción funcional y operacional de la acción propuesta, una descripción del área de servicio que incluya la oferta y demanda de la acción propuesta en dicha área y del impacto socioeconómico de la misma.

Luego de examinado el estudio de viabilidad económica sometido al Departamento de Salud por el proponente-recurrido, a la luz de los requisitos dispuestos en cuanto al particular por el Reglamento Núm. 89,

*supra*, concluimos que éste cumplió esencialmente con los mismos. Siendo ello así, el hecho de que los recurrentes no estuvieran conformes con la información provista no constituye causa que justificara retrasar la celebración de la vista del caso. Más aún, la información financiera requerida por éstos surgía, aunque no desglosada, del referido estudio de viabilidad, tal como lo expresara la Oficial Examinadora de la agencia en su informe.

Ciertamente, los representantes legales de los recurrentes tuvieron la oportunidad, en dos (2) ocasiones. de reunirse con los del proponente-recurrido antes de la vista del caso y aclarar en esa reunión los asuntos relacionados a dicha información, pero no aprovecharon la misma. De este modo, entendemos que los planteamientos expuestos ante la agencia por éstos en apoyo de su solicitud de suspensión de la vista no constituyeron causa justificada que ameritara tomar dicho curso de acción, al tenor de la L.P.A.U. y del Reglamento Núm. 85.

En cuanto al segundo señalamiento de error planteado por los recurrentes, sólo nos resta examinar lo relativo a los requerimientos de éstos en cuanto a la producción de los planos de construcción de las facilidades propuestas. Veamos, pues, si la agencia estaba obligada o no a considerar dichos planos previo a determinar si expedía el CNC al proponente-recurrido.

De la lectura y análisis del Reglamento Núm. 89, *supra*, surge que éste no exige a la parte proponente de una solicitud de CNC someter a la agencia recurrida los planos de construcción de las facilidades que se proyecten desarrollar. En cuanto al particular, este reglamento en su Art. V (2) (c) sólo requiere acompañar la solicitud con: (1) una presentación funcional y operacional de la acción propuesta, (2) una descripción del área de servicio que incluya la oferta y demanda de la acción en dicha área, y (3) una descripción de su impacto socioeconómico. La Ley Núm. 2, *supra*, tampoco requiere someter planos.

Del expediente del caso de autos se desprende que el proponente-recurrido sometió al Departamento de Salud la información requerida en el Art. V (2) (c) del citado reglamento. En adición, sometió a los recurrentes un diagrama conteniendo una descripción gráfica de la acción propuesta. ■ De este modo, entendemos que no incidió la agencia, ni fue irrazonable su curso de acción al denegar los requerimientos de los recurrentes en cuanto a la presentación de los planos de construcción de las facilidades propuestas, previo a la celebración de la vista del caso. Esto tampoco era necesario.

Ante estas circunstancias, las alegaciones presentadas por los recurrentes en cuanto al particular tampoco ameritaban la suspensión de la vista. Son igualmente inmeritorios los señalamientos esbozados por éstos en cuanto a que la agencia debió concederles, a tenor de la orden emitida el 16 de octubre de 1996, el término máximo de treinta (30) días a partir de la fecha de notificación del señalamiento de la vista. Veamos porqué.

De la lectura y análisis del contenido de dicha orden se desprende que el referido término no es uno reglamentario, al haber sido emitida la misma fecha del procedimiento que para la promulgación de reglamentos establece la L.P.A.U. en sus secciones 2.1 a 2.18, *supra*. A la luz de lo anterior, concluimos que dicho plazo es uno directivo, dispuesto por los propios oficiales examinadores de la agencia a los fines de guiar la extensión de la etapa de descubrimiento de prueba en los procedimientos adjudicativos ante sí. Por lo tanto, la extensión o reducción del mismo ha de depender del sano criterio del Oficial Examinador, a la luz de la evaluación que de las particulares circunstancias del caso éste realice, siempre y cuando la determinación final no resulte irrazonable, arbitraria o caprichosa.

Así, pues, entendemos que en el presente caso, la Oficial Examinadora, en el sano ejercicio de su discreción, evaluó las particulares circunstancias de la situación de hechos ante su consideración y determinó que extender la etapa del descubrimiento de prueba hasta el término máximo consignado en la orden de 16 de octubre de 1996 no era necesario. A la luz del escenario fáctico antes descrito, concluimos que dicha determinación no fue irrazonable.

## IV

A los fines de disponer en su totalidad del recurso, sólo nos queda evaluar la procedencia del tercero y último error planteado por los recurrentes. El mismo se dirige a impugnar la apreciación que de la prueba sometida a su consideración hiciera la agencia recurrida previo a la expedición del CNC al Hospital Metropolitano. A tales fines se presentó ante este foro apelativo una exposición narrativa de la prueba oral desfilada ante el organismo administrativo.

Examinemos lo dispuesto por nuestro ordenamiento jurídico sobre la función revisora de los tribunales con respecto a las determinaciones de las agencias administrativas.

De entrada, cabe destacar que dicha función revisora es una de carácter limitado. Es principio reiterado que las conclusiones e interpretaciones de los organismos administrativos especializados merecen gran deferencia si las mismas están sostenidas por evidencia sustancial. Sección 4.5 de la Ley de Procedimiento Uniforme, Ley Núm. 170 de 12 de agosto de 1988, según enmendada, 3 L.P.RA sec. 2175; *García Oyola v. Junta de Calidad Ambiental,* Op. de 1997, **97 J.T.S. 25**; *Metropolitana S.E. v. A.R.P.E.,* 133 D.P.R. 200 (1995).

Este principio descansa en el hecho de que son las agencias administrativas las que poseen la experiencia y los conocimientos altamente especializados (*"expertisse"*) sobre los asuntos que se encuentran dentro del ámbito de sus facultades y responsabilidades. *La Facultad para las Ciencias Sociales v. C.E.S.,* 133 D.P.R. 521 (1993); *Asociación de Doctores v. Morales,* 132 D.P.R. 567 (1993). La interpretación que hagan las agencias administrativas de un estatuto cuya administración se les ha delegado y los fundamentos que aduzcan en apoyo de la misma, resulta de gran ayuda para los tribunales de justicia al éstos encontrarse en la posición de tener que pasar juicio sobre la corrección o no de las decisiones emitidas por dichos organismos. *Molini y Vélez Orthodontics v. Negociado de Seguridad de Empleo,* 115 D.P.R. 183 (1984).

Por tanto, las determinaciones de hechos realizadas por estos organismos tienen a su favor una presunción de regularidad y corrección que prevalece mientras la parte que las impugne no produzca suficiente evidencia para derrotarlas. *Juan R. Costa Wood, Carlos A. Piovanetti Rivera v. Caguas Expressway Motors, Inc. y Caguas Advertising, Inc.,* Op. de 29 de diciembre de 1999, **2000 J.T.S. 11**; *Metropolitana S.E. v. A.R.P.E., supra. La Facultad para las Ciencias Sociales Aplicadas v. Consejo de Educación Superior, supra; Aulet Lebrón v. Depto. de Servicios Sociales,* 129 D.P.R. 1 (1991); *A.R.P.E. v. Junta de Apelaciones Sobre Construcciones y Lotificaciones,* 124 D.P.R. 858 (1989); *M. & B. S. v. Depto. de Agricultura,* 118 D.P.R. 319 (1987); *Murphy Bernabé v. Tribunal Superior,* 103 D.P.R. 692 (1975); *Monllor & Boscio v. Comisión Industrial,* 89 D.P.R. 397 (1963).

Siendo así, la intervención con dichas determinaciones sólo estará justificada cuando la agencia obre de manera arbitraria, ilegal, o en forma tan irrazonable que su actuación constituyera un abuso de discreción, o cuando la determinación no se sostenga mediante prueba sustancial. *Misión Industrial de P.R. Inc. v. Junta de Planificación,* Op. de 30 de junio de 1997, **97 J.T.S. 34**; *Fuertes v. A.R.P.E.,* 134 D.P.R. 947 (1993); *Murphy Bernabé v. Tribunal superior, supra.* Por ello, los tribunales deben indagar sobre la razonabilidad de la decisión administrativa y no deben sustituir el criterio de dicho organismo por el suyo propio a menos que la actuación administrativa sea totalmente arbitraria o que se infrinjan valores constitucionales fundamentales. *La Facultad para las Ciencias Sociales v. C.E.S., supra.*

De conformidad con esta normativa, sobre la parte que impugna la determinación de la agencia recae el peso de probar que la misma fue arbitraria, irrazonable o que se tomó en ausencia de evidencia sustancial. *Henríquez v. C.E.S.,* 120 D.P.R. 194 (1987). Para que los tribunales puedan concluir que la evidencia que obra en el expediente administrativo no es sustancial, la parte afectada debe demostrar que existe *"otra prueba en el récord que razonablemente reduzca o menoscabe el peso de tal evidencia, hasta el punto de que un tribunal no pueda, concienzudamente, concluir que la evidencia sea sustancial, en vista de la totalidad de la prueba presentada, ...hasta el punto que se demuestre claramente que la decisión de la [agencia] no está justificada*

*por una evaluación justa del peso de la prueba". Metropolitana S.E. v. A.R.P.E., supra; Hilton Hotels v. Junta Salario Mínimo,* 74 D.P.R. 670 (1953). Asimismo, la apreciación de la prueba que realizara el organismo administrativo debe prevalecer en ausencia de pasión, prejuicio y parcialidad o error manifiesto. *Gallardo v. Petiton.* 132 D.P.R. 39 (1992); *Rivera Pérez v. Cruz Corchado,* 119 D.P.R. 8 (1987). *Quintana Tirado v. Longoria,* 112 D.P.R. 276 (1982).

En síntesis, nuestra función es examinar la totalidad del expediente ante nuestra consideración y refrendar la decisión del organismo administrativo si está basada en evidencia sustancial. *Junta de Relaciones del Trabajo* v. *Línea Suprema, Inc.,* 89 D.P.R. 84 (1964).

El Tribunal Supremo ha expresado que la decisión de otorgar o denegar un certificado de necesidad y conveniencia surge de un proceso evaluativo institucional, que culmina con la decisión personal del Secretario. *Laboratorio Clínico Instituto Central Medicina Avanzada v. Laboratorio Clínico Borinquen, Inc., supra; Hosp. San Pablo v. Hosp. Hnos. Meléndez,* 123 D.P.R. 720 (1989). Se trata de un proceso que requiere la evaluación de muchas circunstancias y factores complejos, y la ponderación de varios criterios diversos. *Hosp. San Pablo v. Hosp. Hnos. Meléndez, supra; Ruiz Hernández v. Mahiques, supra.*

De lo previamente expuesto surge que la decisión final del Secretario apareja el uso de su discreción. No obstante, tal decisión no puede tomarse sin antes considerar numerosos elementos y pasar juicio sobre distintas consideraciones, para entonces determinar qué es lo más conveniente al interés general y al bien común. *Ruiz Hernández v. Mahiques, supra.* Es por ello que el Art. 3 de la Ley Num. 2, *supra,* establece los criterios a ser considerados por el Secretario de Salud a la hora de determinar si se expide o no un C.N.C., a los fines de guiar el ejercicio de la discreción que posee este funcionario:

*"El Secretario establecerá mediante reglamento los criterios para expedir o denegar el certificado de necesidad y conveniencia. Al establecer dichos criterios, el Secretario tomará en consideración las guías generales establecidas en la ley federal y en las secs. 334 a 334j de este título, conforme a la política pública y estrategia de desarrollo adoptada por la Junta de Planificación, incluyendo el Plan de Desarrollo Integral.*

*Entre dichos criterios entrarán los siguientes:*

*(1) La relación entre la transacción para la cual se solicita el certificado y el plan de desarrollo de servicios a largo plazo, si alguno, del solicitante.*

*(2) La necesidad actual y proyectada que tiene la población a ser afectada por la transacción contemplada de los servicios que se proveerán mediante la misma.*

*(3) La existencia de alternativas a la transacción para la cual se solicita el certificado o la posibilidad de proveer los servicios contemplados de manera más eficiente o menos costosa que la propuesta por el solicitante.*

*(4) La relación entre el sistema de salud operante en el área y la transacción propuesta.*

*(5) En el caso específico de solicitantes de certificados de necesidad y conveniencia para el ofrecimiento de servicios de salud, el Secretario deberá considerar también los siguientes factores:*

*(a) La disponibilidad de recursos humanos y económicos para el rendimiento eficiente de esos servicios.*

*(b) El impacto que la forma de proveer los servicios tendrá sobre las necesidades de entrenamiento clínico que puedan tener los profesionales de salud del área en donde los servicios habrán de prestarse.*

*(c) El por ciento de la población del área a ser servida que tendrá acceso a los servicios propuestos. El*

*Secretario deberá exigir que la solicitud indique el tiempo que el solicitante necesitará para hacer disponible el servicio o equipo objeto de la petición o realizar el gasto objeto de la transacción."* ■

A tenor con la directriz establecida en la referida ley, el Secretario de Salud aprobó el Reglamento Núm. 89 donde instrumentó los criterios a considerar para expedir o denegar un C.N.C. En dicho Reglamento se establecieron criterios de tipo general y específico que constituyen factores de análisis para la evaluación de la conveniencia y necesidad de la facilidad propuesta. Específicamente, el artículo VI de dicho reglamento prescribe los criterios a evaluar en toda solicitud de un C.N.C. Dichos factores son los mismos que establece la Ley Núm. 2, y que fueran previamente citados. No obstante, este articulado añade que el nivel de competitividad y de eficiencia operacional de las facilidades de salud existentes en el área de servicio de la acción propuesta, el nivel de concentración existente en el área de servicio de dicha acción, y la medida en que un incremento en la oferta estimule la competencia en cuyo caso se podría favorecer la acción propuesta, son también criterios a considerarse a la hora de extender un C.N.C.

De otra parte, el Art. IV del Reglamento Núm. 89 consigna la aplicabilidad de la pieza para los casos de aumento en el número de camas autorizadas a un hospital o de redistribución de camas entre categorías, aunque no se altere la capacidad autorizada. El Art. V de este reglamento dispone los requisitos necesarios para considerar una solicitud de certificado de necesidad y conveniencia a los fines de guiar y limitar el ejercicio de la discreción del Secretario de Salud. Son los siguientes:

*"1- Todo proponente deberá notificar por escrito al Secretario su intención de llevar a cabo cualquier actividad o transacción que requiera la concesión de un Certificado de Necesidad y Conveniencia o la expedición de una certificación de exención con no menos de 30 días de antelación a la fecha en que habrá de presentar su solicitud para la obtención del Certificado de Necesidad y Conveniencia o el certificado de exención.*

*2- Toda solicitud deberá ser presentada por escrito utilizando el formulario que a esos fines determine el Departamento de Salud en la Secretaría Auxiliar de Reglamentación y Acreditación de Facilidades de Salud y deberá venir acompañada de los siguientes documentos:*

*(a) Un comprobante de Rentas Internas por la suma de $100.00, excepto aquellas solicitudes presentadas por cualquier instrumentalidad del Gobierno de Puerto Rico, el Gobierno de los Estados Unidos o cualquier Gobierno Municipal.*

*(b) Una certificación indicando el nombre, dirección postal y localización de todas aquellas facilidades de salud del mismo tipo existentes en el área de servicio según el tipo de facilidad de salud a establecerse. En el caso de aquellas facilidades de salud cuya área de servicio la constituya la milla radial, deberá incluirse un mapa de zonificación certificado por un agrimensor licenciado indicando el radio de la milla y las facilidades de salud incluidos en dicho radio.*

*(c) Un estudio financiero de viabilidad económica del proyecto así como del impacto del mismo, si alguno, en relación con las facilidades de salud existentes en el área de servicio de la acción propuesta. El estudio deberá incluir una descripción de la metodología utilizada, una descripción funcional y operacional de la acción propuesta, una descripción del área de servicio que incluya la oferta y demanda de la acción propuesta en dicha área y del impacto socioeconómico de la misma.*

*(d) El tiempo que el solicitante estime que necesitará para llevar a efecto la acción propuesta.*

*(e) Dentro del término máximo de 30 días o en un término de tiempo menor a partir de la fecha de presentación de la solicitud, la Secretaría Auxiliar de Reglamentación y Acreditación de Facilidades de Salud procederá a publicar un aviso, una vez, en un periódico de circulación general en el país con un resumen de la acción propuesta y de igual modo notificará a las personas afectadas por la acción propuesta mediante carta*

*circular remitida en correo regular.*

*(f) La notificación antes mencionada advertirá a las partes afectadas de su derecho a someter ante la División de Vistas Administrativas de la Oficina de Asesores Legales del Departamento de Salud su oposición a la concesión del Certificado de Necesidad y Conveniencia solicitado dentro del término perentorio de 15 días a partir de la fecha de envío de la notificación antes mencionada o la fecha de la publicación del edicto, lo que ocurra más tarde.*

*(g) Una vez realizada(s) las notificaciones y la publicación del edicto, la Secretaría Auxiliar de Reglamentación y Acreditación de Facilidades de Salud, remitirá inmediatamente el expediente del caso sin la emisión de informe alguno a la División de Vistas Administrativas de la Oficina de Asesores Legales para el señalamiento de la vista pública en todos aquellos casos que así lo requieran.*

*3- El procedimiento administrativo y la celebración de la vista pública se regirán por las disposiciones del Reglamento del Secretario de Salud para Regular los Procedimientos Adjudicativos en el Departamento de Salud y sus Dependencias. La parte proponente tendrá en todo procedimiento administrativo el peso de la prueba y la obligación de establecer que su solicitud compara favorablemente con los criterios generales aplicables. [...]"*

En el presente recurso, los peticionarios no nos han puesto en condiciones de ejercer nuestra discreción hacia su reclamo, por no haber demostrado con la evidencia suficiente, que la presunción de regularidad y corrección que tienen a su favor las determinaciones de los organismos administrativos ha quedado derrotada. Por el contrario, lo que surge es que la decisión administrativa estuvo plenamente justificada y que la evaluación que hizo la agencia de la prueba que tuvo ante sí fue justa. En ausencia de prueba que menoscabe tal evidencia tenemos la obligación de respetar tal determinación.

Cabe destacar que en el informe que sirvió de base a la resolución recurrida, la Oficial Examinadora esbozó los criterios legislativos y reglamentarios aplicables al caso y a la luz de los mismos concluyó: (1) que la solicitud de expedición del CNC instada por el proponente-recurrido, cumplió sustancialmente con éstos, y (2) que la acción propuesta era necesaria y conveniente, no surgiendo de dicho informe ni de la totalidad del expediente, visos de arbitrariedad que muevan a este Tribunal a alterar la determinación de la agencia encargada de administrar la Ley Núm. 2, quien posee el *"expertisse"* necesario en esta materia.

Por los fundamentos antes expuestos, se deniega el recurso instado.

Lo acordó y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 2001 DTA 132

**1.** El P. del S. 1233 se aprobó como la Ley Núm. 2 de 7 de noviembre de 1975, *supra.*

**2.** Reglamento Núm. 89 de 20 de octubre de 1997 para regular el proceso de evaluación de solicitudes para el otorgamiento de certificados de necesidad y conveniencia y derogar el Reglamento Núm. 56 del Secretario de Salud.

**3.** Véase Apéndice del recurso, a la pág. 127.

**4.** Véase Apéndice del recurso, a la pág. 152.

**5.** 24 L.P.R.A. §334b.